Allen Murray Myers, J.
Plaintiff sues upon a major medical expense policy issued by defendant’s predecessor, covering plaintiff, his' wife, and children. Subject to the limitations *203 contained in the policy, defendant agreed to reimburse plaintiff for loss “ resulting from (1) sickness of the insured, contracted and commencing while this policy is in force,— or (2) bodily injuries of the insured caused by an accident occurring while this policy is in force ”.
Plaintiff’s cause of action depends upon the interpretation of a clause in the policy which puts a limit on the amount recoverable for ‘ ‘ hospital room and board and necessary hospital services and supplies including medicines administered in the hospital ’ ’ which 1 ‘ are incurred for the treatment of mental disease or deficiencies or psychotic or psychoneurotic disorders or actions ”.
Plaintiff argues that he is not limited by the said clause, while the defendant argues that he is, and has moved for summary judgment.
The defendant has paid and the plaintiff has accepted the amount payable under the limitation clause without prejudice to plaintiff’s right to recover an excess if the court should find that that clause was not applicable.
The material facts are not in dispute. The policy was issued on November 10, 1961. It covered the plaintiff and his son, Charles, who was born on February 12, 1956. The claim is for expenses incurred by the plaintiff during the period September 11,1966 to April 15, 1967 at the Woods Schools and Residential Treatment Center in Langhorne, Pa., for room, board, treatment and therapy of plaintiff’s son, Charles.
Charles was abnormal from the day of his birth. Dr. Donald R. Kirsch, a child neurologist and pediatrician, who is plaintiff’s expert, stated in an affidavit submitted on this motion, that “ he (Charles) did not attain the milestones that children ordinarily attain at the usual time. * * * he did not begin to walk at the time children usually begin to walk; he did not begin to talk at the time children usually begin to talk; he did not begin to smile at the time children usually begin to smile; he did not begin to think at the time children usually begin to think, and generally, he did not react the way children of the same age normally react. Unfortunately, Charles did not develop normally.”
Dr. Hirsch further stated in a letter to the defendant dated October 17, 1966, that,
‘ ‘ It was obvious at about three months of age that Charles suffered from psychomotor retardation. The degree was not known at that time. With each year that passed, it became more apparent that Charles ’ deficiencies were very profound.
“ The original recommendations were that he be maintained *204 at home and attend local schools, and that this course be pursued as long as possible.
‘ ‘ In recent years it has become apparent that home care is no longer possible or productive for Charles. It was therefore recommended that a residential school be found.”
Accordingly Charles was enrolled in the Woods Schools on June 20, 1966 and this action was instituted to recover the charges incurred therein exceeding the amount paid in accordance with the limitation clause of the policy.
A transcript of the initial physical examination of Charles conducted on August 12, 1966 by Dr. Julio E. Vassalluzzo, Director of Medical Services of the Woods Schools and submitted to the court states under the heading of ‘ ‘ Psychological Testing ” that the tests “ revealed an I.Q. below 50, poor coordination and notes that Charles is functioning at the 4 to 5% year level ’ ’ when Charles was 10% years of age.
It also states under the heading of “Background History,” that Charles “ entered The Woods Schools on June 20, 1966 with a diagnosis of encephalopathy of unknown origin with structural reactions manifest and psychiatric impairment”. Funk & Wagnalls unabridged New Standard Dictionary (1933) defines “ encephalopathy” as “disease of the brain or of its membranes” and “psychiatry” as “the branch of medicine that relates to mental diseases ”. The court notes that Charles would come within the definition of a “ mental defective ” as set forth in subdivision 9 of section 2 of the Mental Hygiene Law.
The Court of Appeals has said that such ‘ ‘ meaning must be given to the terms used [in a policy] as would be ascribed to them by the average man in applying for insurance and reading the language of the policy at the time it was written ”. (McGrail v. Equitable Life Assur. Soc., 292 N. Y. 419, 424.) So read, the expenditures claimed by plaintiff would clearly appear to have been incurred for the treatment of mental disease or deficiencies and thus would be subject to the limitation clause as claimed by defendant.
However, plaintiff argues that he is entitled to recover in excess of the amount limited by the mental disease clause because Charles’ condition resulted from an accident, sickness or injury which occurred prior to birth, during birth or immediately after birth, and that his condition is not a mental disease or deficiency or psychotic or psychoneurotic disorder or reaction. On the contrary, Charles is suffering from ‘ ‘ brain damage, brain injury and psychomotor retardation ”.
*205 This defense is untenable for two reasons. First, because while the language used is different, its meaning is not materially different from that used in the limitation clause. Secondly, there is not a scintilla of evidence submitted that Charles ever had suffered any injuries as a result of an accident and certainly not while the policy was in force. Clearly, there is insufficient evidence to supply a factual basis for Dr. Hirsch’s opinion that “a prenatal and/or neonatal sickness and/or birth accident” may have been the cause of Charles’ mental condition. (Deutsch v. Doctors Hosp., 21 A D 2d 775.) And, even if, arguendo, there were sufficient evidence to support Dr. Hirsch’s theory it would not bring this case within the rationale of Prince v. United States Life Ins. Co. (42 Misc 2d 410, affd. 23 A D 2d 723, affd. 17 N Y 2d 742). In the Prince case, a 10-year-old, perfectly healthy, normal boy, met with an accident during the life of the policy, which resulted in the enucleation of his left eye. As a result, the boy suffered a psychoneurotic reaction which necessitated psychiatric treatment. In that case (p. 412), the court held that, 11 A layman would read the exception as applying to mental disorders unconnected with bodily injury. The disorder before me was concededly caused by bodily injury.” The psychiatrist’s bills were therefore allowed. Obviously in that case the psychiatric treatment was merely incidental to the treatment for a severe trauma.
In the case at bar, plaintiff’s efforts to contort the facts into the Procrustean bed of the Prince case are transparent. They do not fit.
This court can find no ambiguity in the clause in question. Charles was a congenital mental case. Although the cause of his condition may be unknown, even if it could be determined, it would be irrelevant for concededly the “ sickness ” or 11 injury ” did not commence or occur while the policy was in force but long before.
There are no triable issues of fact. The limitation clause is applicable. The defendant’s motion for summary judgment is therefore granted.
(Reargument, October 17, 1968.)
Motion for reargument and/or rehearing granted and upon such reargument the court adheres to its original decision. The court was cognizant of the two-year incontestability clause in the insurance contract. It therefore did not base its decision on the . ground “ that a disease or physical condition * * * had existed prior to the effective date of coverage This *206 clause was not in issue since defendant acknowledged its liability under the policy and paid the claim in spite of Charles’ preexisting mental condition. The only issue before the court was whether plaintiff’s claim was for charges “ incurred for the treatment of mental disease or deficiencies ” in which event plaintiff would not be entitled to the additional sum sued for herein. The court found no difficulty in determining from the undisputed facts that Charles was suffering from a “ mental disease or deficiency ” from birth. In interpreting these words, the court applied the “average man ” interpretation test required by the Court of Appeals in McGrail v. Equitable Life Assur. Soc. (292 N. Y. 419,424). The speculations of Dr. Hirsch as to what caused the “mental disease or deficiency,” and whether it was functional or organic are not relevant.